Mary Lou TRACY, on behalf of herself and others similarly situated, Plaintiffs,

v.

DEAN WITTER REYNOLDS, INC., Defendant.

No. Civ.A. 96 Z 501.

United States District Court, D. Colorado.

Feb. 24, 1998.

John R. Holland, John Holland, P.C., Denver, CO, Kathleen Mullen, Kathleen Mullen, P.C., Denver, CO, Michael D. Hausfeld, Sharon A. Snyder, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for plaintiffs.

Ronald Michael Green, Evan J. Spelfogel, Epstein, Becker & Green, New York, Cathy H. Greer, Pamela Leggett Skelton, Ritsema & Lyon, P.C., Denver, CO, for defendant.

**ORDER**

SCHLATTER, United States Magistrate Judge.

Plaintiffs are non-exempt employees of Dean Witter Reynolds (Dean Witter) who claim in this lawsuit that Dean Witter has failed to pay them overtime compensation for hours of overtime which they worked and reported, in violation of the Fair Labor Standards Act (FLSA). They have filed a Motion to Extend Discovery. The effort to obtain extended discovery in this case is part of plaintiffs' efforts to obtain the certification of a class for purposes of a class action and/or collective action against Dean Witter. Fed. R.Civ.P. 23; 42 U.S.C. § 216(b). To date, I have allowed plaintiffs to conduct discovery only in the Dean Witter office which is located at the Denver Tech Center.

Dean Witter has approximately 400 offices throughout the nation, and employs approximately 8,000 non-exempt employees. Plaintiffs seek in this present motion an order

which will authorize them to conduct discovery from other Dean Witter offices on a graduated basis: initially from 40 of the Dean Witter offices, later from all 800 of the offices. Dean Witter vigorously objects to plaintiffs' efforts to extend discovery.

I conducted a hearing on plaintiffs' motion on February 4, 1998. Having considered the briefs, and having heard arguments of counsel, I find that plaintiffs' have failed to persuade me that extended discovery should be allowed in this case. Therefore, plaintiffs' motion will be denied.

## I. BACKGROUND

I am not asked to consider whether a class action or collective action should be certified in the circumstances of this case. Plaintiffs have filed a Motion for Class Certification, and that motion is pending before Judge Weinshienk. At this stage of the proceedings, Judge Weinshienk has not accorded either class status, or conditional class status, to the persons whom plaintiffs allege should be included in this case, nor has she permitted plaintiffs to send notice to prospective members of the class.

My responsibility in this case is to regulate and govern the discovery proceedings. At the time of the scheduling conference, May 3, 1996, plaintiffs asked to be permitted to take discovery from offices beyond the Denver Tech Center, and I denied that request. I ruled at that time that I would not allow plaintiffs' to conduct discovery beyond the Denver Tech Center unless or until they could present facts which demonstrated that there was a reasonable likelihood that Dean Witter had a national policy or practice to deny overtime to its employees in violation of the FLSA.

Plaintiffs renewed their request for extended discovery on several subsequent occasions, and on each occasion I denied those requests. I found that plaintiffs had not presented sufficient evidence to satisfy me that Dean Witter had a national policy or practice which violated the FLSA. Objections were taken by the plaintiffs from each of my rulings. On each occasion, Judge Weinshienk overruled plaintiffs' objections, and affirmed my rulings.

Plaintiffs' latest motion was filed on September 16, 1997. In this motion, plaintiffs argue that the discovery which has been conducted locally, at the Dean Witter office at the Denver Tech office, demonstrates that "Dean Witter Reynolds does, in fact, have a nationwide *de facto* policy and practice of refusing to pay earned and reported overtime wages as required by the FLSA." Pl. Mtn, p. 20. Plaintiffs argue:

> This failure to compensate full-time, non-exempt employees in the Denver office for overtime was hardly the result of inadvertence or coincidence. Instead it was the product of a coherent, clearly established and regularly honored policy of denying payment for overtime to employees who earned it.

Memo. Class Cert., 3–4.

## II. PRINCIPLES OF LAW

District Judge Edward W. Nottingham of this Court has explained convincingly that the procedures for a collective action pursuant to Section 216 should be the same as those procedures which are provided for a class action under Rule 23. *Shushan v. University of Colorado,* 132 F.R.D. 263, 268 (D.Colo.1990); *see also, Bayles v. American Medical Response of Colorado,* 950 F.Supp. 1053, 1060–61 (D.Colo.1996) (Babcock, J.). Thus, in weighing whether plaintiffs have presented sufficient evidence to justify extended discovery in this case, I make no distinctions as between plaintiffs' efforts to obtain certification of either, or both, a class action or a collective action. Both types of actions must satisfy the requirements which are associated with numerosity, commonality, typicality and adequacy of representation. Fed.R.Civ.P. 23(a)(1)–(4).

Obviously, some discovery is necessary prior to a determination of class certification. *National Organization for Women v. Sperry Rand Corp.,* 88 F.R.D. 272, 276 (D.Conn.1980); *see also, East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 405–06, 97 S.Ct. 1891, 1897–98, 52 L.Ed.2d 453 (1977). However, the recognized need for pre-certification discovery is subject to limitations which may be imposed

by the court, and any such limitations are within the sound discretion of the court. *National Organization for Women*, 88 F.R.D. at 277; *Chateau de Ville Productions, Inc. v. Tams–Witmark Music Library, Inc.*, 586 F.2d 962, 966 (2d Cir.1978). The discovery which is permitted should be sufficiently broad that the plaintiffs have a fair and realistic opportunity to obtain evidence which will meet the requirements of Rule 23, yet not so broad that the discovery efforts present an undue burden to the defendant. *National Organization for Women*, 88 F.R.D. at 277. "Discovery is not to be used as a weapon, nor must discovery on the merits be completed precedent to class certification." *Id.*

■ In managing discovery in cases of this nature, district courts are required to balance the need to promote effective case management, the need to prevent potential abuse, and the need to protect the rights of all parties. *Shushan v. University of Colorado*, 132 F.R.D. at 268. Class plaintiffs are not permitted to send notices to prospective members of a class if the only evidence of a class action consists of the bare allegations of the complaint, or of counsel. *Id; see also Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266 (D.Minn.1991). Before notice to the class will be authorized in this district, one court requires that plaintiffs meet all of the requirements of a Rule 23 class action. *Shushan*, 132 F.R.D. at 268. However, at this stage of the proceedings, I need not decide whether the requirements of Rule 23 have been met. That decision is to be made by Judge Weinshienk when she rules on plaintiffs' motion for class certification. I need only decide whether plaintiffs have presented sufficient information to persuade me that they ought to be allowed to conduct discovery from Dean Witter offices beyond the Denver Tech Center.

Before classwide discovery is allowed, plaintiffs must demonstrate that "there is some factual basis for plaintiffs' claims of classwide discrimination...." *Severtson v. Phillips Beverage Co.*, 137 F.R.D. at 267. The plaintiff "bears the burden of advancing a prima facie showing that the class action requirements of Fed.R.Civ.P. 23 are satis-

fied, or that discovery is likely to produce substantiation of the class allegations." *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir.1985). In the circumstances of this case, plaintiffs have not persuaded me that any discovery beyond Denver Tech Center is likely to produce substantiation of the class allegations which they have made.

## III. DEFINITIONS

■ Plaintiffs allege and argue that the national policy or practice of Dean Witter is to deny overtime compensation to employees who have earned it. In reading the briefs, and in listening to the arguments of counsel, I noted a certain confusion over the use of the terms "policy" and "practice." In the context of this case, I understand the term "policy" to refer to a rule, regulation or directive which has been announced or published by Dean Witter, either verbally or in writing, to its local supervisors and/or employees. I understand the term "practice" to refer to that which supervisors or employees do, that is, their actions, whether pursuant to policy or not. Thus, when plaintiffs allege that Dean Witter has both a "policy and practice" which unlawfully deprives employees of overtime compensation (PI.Mtn, p. 20), I understand plaintiffs to mean by the phrase "unlawful policy" that Dean Witter has published or announced to supervisors and employees through a handbook, letter, memo or other means, that employees will not be paid for any overtime hours that they work.

Throughout their motions and memorandums, plaintiffs are frequently unclear in their use of the terms "policy" and "practice." In light of the definitions which I understand for the terms "policy" and "practice," plaintiffs frequently appear to use the term "policy," when they mean "practice," or "practice" when they mean "policy." If plaintiffs use the term "policy," they should be held to the meaning which makes sense in the circumstances of this lawsuit. Thus, where plaintiffs argue that the national *policy* of Dean Witter is unlawful, they must be understood to be saying that Dean Witter has published and announced a *policy* which is in violation of the law, and that by implementing this policy the Dean Witter branch

managers are engaged in unlawful *practices*. In such circumstances, plaintiffs have an obligation to produce such an "unlawful policy," meaning, a directive or memorandum which states a policy that is, on its face, unlawful. Plaintiffs are obligated to produce such an unlawful policy because a party's "practice" does not always or necessarily translate into "policy." As I note below, plaintiffs have never produced any such "unlawful policy."

In some places in their memorandums, plaintiffs appear to concede that the national *policy* of Dean Witter is lawful, but that the national *practice* with regard to such a policy is not. If this is the position of the plaintiffs, intellectual honesty requires that plaintiffs admit that the national policy is lawful, and focus instead on the actions, or *practices*, of the Dean Witter administrators and supervisors which are allegedly unlawful. Actions or practices are discrete events, or facts, and plaintiffs are free to argue any inferences which logically flow from such facts.

In other places in their memorandums, plaintiffs appear to concede that Dean Witter publishes a national policy which is lawful, but argue that Dean Witter implements a "*de facto* policy" which is unlawful. *See e.g.*, Pl. Mtn, pp. 16, 20, 22 & 27; Pl. Reply, p. 14. In the circumstances of this case, the phrase "*de facto* policy" either blurs the distinction between policy and practice, or attempts to blend the two, possibly because there may be facts to support one of the words, but not the other—evidence of practices, for example, but no evidence of policy. Policy refers to that which is directed through publication, while *de facto* refers to that which is actually done. If fifty people are walking in the same direction, that is the event, or *de facto;* if the fifty people have been told by a single source to walk in a particular direction, their common direction reflects that they are walking pursuant to the directive, or policy. The distinction needs to be kept in mind throughout the dispute which arises from plaintiffs' motion to extend discovery, because fifty people walking in the same direction may or may *not* be doing so pursuant to policy or directive, depending upon the evidence which is available.

Plaintiffs may be attempting to argue that Dean Witter has pursued an unpublished national policy which is, or must be, unlawful, because so many supervisors have allegedly violated a policy which is conceded to be lawful, and admittedly has been published. If this is plaintiffs' argument, they would be saying that the Court should ignore the fact that Dean Witter has published a lawful policy. The Court should, instead, find or infer the existence of a national policy which is not only unlawful, but which is, apparently, unwritten and unpublished. Before I would reach such an inference, I would expect plaintiffs to be able to demonstrate how it would be possible for the supervisors in 400 separate Dean Witter offices to behave in unison in the absence of any announced or published directions, either verbally or in writing, from national headquarters.

On the other hand, plaintiffs may be attempting to argue that the discrete events, the various facts which they have marshalled, should lead the Court to infer that Dean Witter's "real" national policy, an unpublished one, is contrary to the policy which has been published. After plaintiffs have marshalled their facts, however, they must still demonstrate that there is a reasonable likelihood that the discrete events have been caused or prompted by directions in some form from national headquarters. If plaintiffs proceed in this direction, they must demonstrate in their motion to extend discovery that there are sufficient discrete events, or practices, in sufficient numbers of offices, to warrant an inference that the branch managers are acting pursuant to directives from national headquarters.

## IV. DEAN WITTER'S PUBLISHED NATIONAL POLICY

It is beyond dispute that the national *policy* of Dean Witter is to pay overtime compensation to employees who have obtained approval to work overtime, and who have actually worked beyond 40 hours per week. In conjunction with its response to plaintiffs' efforts to obtain extended discovery, Dean Witter submitted documents which contain its published policies with regard to overtime. One document is entitled "Administra-

tive Policy Manual," and it provides as follows:

> The necessity for overtime work is determined solely by managers and supervisors, who will authorize specific employees in advance to work extra hours.
>
> \*\*\*
>
> The Company pays overtime pay (1.5 times the regular rate of pay) to all full-time non-exempt employees for all hours worked in excess of 8 hours in a work week day. All other non-exempt employees must be paid overtime pay for hours worked in excess of 40 hours in a work week.

Defts' Opp., Ex. A, at Part VI, "Personnel." Plaintiffs do not deny that Dean Witter distributes this policy on a nationwide basis.

Dean Witter also publishes and distributes a handbook which is entitled "Your Employee Policies Handbook." Presumably, this handbook is provided to all employees, or is available to them. The handbook states:

> Managers and supervisors must decide whether overtime work is necessary and they must authorize extra hours in advance. No employee is to work overtime without specific prior approval. If you are a non-exempt employee (i.e., an employee eligible for overtime compensation in accordance with applicable federal and state wage and hour laws), you will be paid one and one half times your regular rate of pay for eligible excess hours worked each day, depending upon your job classification.

*Id.*

## V. DEAN WITTER'S IMPLEMENTATION OF ITS POLICY

Dean Witter implemented its policies on compensation, including overtime compensation, in part through its central, or national, Payroll Department. That department is located at national headquarters in New York City. In support of its contention that the national policies and practices of Dean Witter are exactly the opposite of those which are claimed by plaintiffs, Dean Witter offered the affidavit of one of the former officers of the Payroll Department, Michael Castrogiovanni. *See* Defts' Opp., Ex E.

Mr. Castrogiovanni states in his affidavit that he has been employed by Dean Witter since 1989. He is currently employed in its Executive Compensation Department, and he was previously employed in Dean Witter's Payroll Department. In his affidavit, he states that employees who work overtime hours, and who properly report their hours, are paid overtime wages. *Id.* at ¶ 3.

Mr. Castrogiovanni explains that employees are required to fill out time cards, called Time & Absentee Reports, or TAR's. These forms contained "spaces for the employees to enter on a daily basis the times they arrived at work, began lunch, ended lunch and left work at the end of the day." *Id.* at ¶ 2. Mr. Castrogiovanni stated:

> 3. [I]t was the responsibility of the individual employees to enter their overtime hours worked, if any, in spaces available for that purpose on the TAR forms directly next to or adjacent to each day's "in/out times." The process of recording the time that an employee worked was one that placed upon the employee the obligation to record accurately his or her hours and the Company had always made it clear to employees that they were to report their time worked accurately and that they would be paid for all overtime worked. The Payroll Department did not attempt to verify the accuracy of the employees' representations as to hours worked, but rather, entrusted the employees with that responsibility.
>
> 4. At the end of each pay period, individual branch operation managers compiled the relevant TAR forms from the non-exempt employees in their branch, they and/or the employee entered the *total number of hours worked* for each employee for each week on the TAR form....
>
> 5. ... [T]he Payroll Department employees merely input the information into the payroll system as reflected on the TAR forms and then generated a paycheck. If the Weekly *Total* on the TAR forms reflected 40 hours worked for a particular week, that information was entered into the system and the employee paid therefor. If the TAR forms showed overtime *totals*, the Payroll Department employees made the necessary entries into the payroll

system, and the Company paid the employee for this time. This was so whether the overtime was "authorized" or not. Finally, if the Weekly Total column on the TAR forms was not filled in employees were paid for 40 hours. This is so because Dean Witter's payroll system for full-time non-exempt personnel was designed to ensure that those employees were paid for 40 hours per week, no more nor less, unless specifically noted to the contrary in the Weekly Total column on the TAR form.

*Id.* at ¶¶ 3, 4 & 5 (emphasis in original).

Plaintiffs argue that the affidavit of Mr. Castrogiovanni "for the most part supports plaintiffs' position in this case." Pl. Reply, p. 9. This would be true only if one accepts the misleading quotations and mis-statements which plaintiffs attribute to Mr. Castrogiovanni in their Reply memorandum. Plaintiffs state that Mr. Castrogiovanni "admits" that "the New York Payroll Department, by intention and design, routinely ignored all the proof of overtime recorded in the 'In/Out' entries . . . ." Such an argument is misleading in light of the totality of Mr. Castrogiovanni's testimony, as quoted above.

Plaintiffs quote portions of Mr. Castrogiovanni's affidavit in such a manner that the quotation might demonstrate that he said that the Payroll Department would pay 40 hours if 40 hours were entered in the total column, that he said that the Payroll Department would pay 40 hours if nothing were entered in the total column, but that he said nothing at all about what the Payroll Department would do if more than 40 hours were reported in the total column. Plaintiffs omitted from the quotation the portions of Mr. Castrogiovanni's affidavit in which he stated that the Payroll Department would pay overtime if more than 40 hours were reported in the total column of the TAR. Pl. Reply, pp. 10–11. This type of manipulation of testimony by plaintiffs prompted me to routinely check and confirm all of their quotations, causing me to find a less than loyal fealty to the overall tone and substance of the quoted materials.

Plaintiffs argue:

in actual practice, the proof of overtime hours submitted on Time and Absentee Report sheets to the New York Payroll Department by the full-time, non-exempt workers at the Denver Tech Center office simply did not matter. They were not paid for any of their reported overtime by the New York Payroll Department.

Pl. Mtn, ¶ 21. This argument mis-states the "actual practice" of the Payroll Department according to Mr. Castrogiovanni. It is apparent from Mr. Castrogiovanni's affidavit that the key entry on the TAR's for overtime purposes is the entry for "weekly total." The Payroll Department performed only data entry functions, not accounting functions. There is nothing facially unlawful about such a practice. If the weekly total for an employee reflected overtime, Dean Witter paid overtime. However, if the employee failed to include a weekly total, Dean Witter paid for only 40 hours per week. It was the responsibility of the employee or supervisor to provide a number in the weekly total, and failure to do so resulted in pay for 40 hours only.

## VI. CONCLUSIONS REGARDING DEAN WITTER'S NATIONAL POLICY

Plaintiffs submitted absolutely no evidence of any Dean Witter policy on overtime which is different from Dean Witter's Exhibit A, which has been quoted above. Plaintiffs have been conducting discovery for over two years. If Dean Witter had a national policy on overtime which completely negates or overturns the policy in Exhibit A, and which has been published to all 400 offices of Dean Witter, I would expect that plaintiffs would have found *some* evidence of such a contrary policy, such as a writing, letter or memo. Dean Witter can hardly direct or influence the application or implementation of a different or contrary policy, on a national basis, without some communication of some kind to all of its offices and branch managers. Plaintiffs have not submitted, and apparently have not located, any evidence of such a communication, and I conclude that no such communication exists. Dean Witter's national policy on overtime is that which is stated in Exhibit A, and it is implemented on a national plane in the manner which is explained by Mr. Castrogiovanni.

## VII. PLAINTIFFS' CLAIMS REGARDING NATIONAL PRACTICE

Plaintiffs' claims in this case arise from the affidavits and depositions of the plaintiffs and several other Dean Witter employees, all women, who complain that they worked overtime, but were not paid for it. Plaintiffs have presented such statements from 10 current or former employees: from 7 employees of the Denver Tech office, and from 3 women in 3 other Dean Witter offices (1 employee of a California office, 1 former employee of an Alaska office, and 1 former employee of a Florida office). *See* Pl. Mtn, Ex's I through O. Plaintiffs argue that these 10 women appear to have had similar experiences in their 4 separate offices, and plaintiffs ask the court to infer that their experiences are reflective of a national practice to deny overtime compensation.

With the exception of the California employee, Patricia Derra–Earl, each of the women testified that they were told by their supervisors that Dean Witter did not pay overtime, or did not pay overtime unless it had been pre-approved. Ms. Derra–Earl testified that there was insufficient work in two California offices with which she was familiar to justify overtime hours. Defts' Opp., Ex. G. In light of her experiences in California, Ms. Derra–Earl hardly provides support for plaintiffs' claim that overtime compensation was denied there.

Dean Witter, on the other hand, points out that all of the employees whose testimony has been submitted by plaintiffs testified only to their own personal experience with overtime compensation. All of them testified that they had no knowledge as to whether their experiences in their particular offices were part of a national practice. *See* Defts' Opp., Ex's B, F, H, & J; Pl. Mtn, Ex's P & O. Thus, the Court is being asked by plaintiffs to infer from the experiences of the seven Denver Tech employees and the two former employees from Alaska and Florida that the national practice of Dean Witter is exactly opposite and contrary to that which is published in its policy manual and personnel handbook.

## VIII. PRACTICE AT DENVER TECH CENTER

To describe the practices at the Denver Tech Center, plaintiffs have presented testimony from the first of two affidavits which were completed by Virginia Romero. Ms. Romero was the Operations Manager at the Denver Tech Center during March 1, 1993, to January of 1995. Plaintiffs argue that her affidavit testimony proves that "the systematic practice of Dean Witter Reynolds at the Denver Tech Center office was to refuse to pay overtime," and that "this practice was well-known and affirmed at the end of every two week pay period by the Dean Witter Reynold's National Payroll Department in New York through its payment of only 40 hours a week to each non-exempt, full-time worker despite its receipt of bi-weekly time and Absentee Report sheets which report extensive overtime beyond 40 hours...." Pl. Mtn, p. 3. Plaintiffs overstate Ms. Romero's testimony. I find that her testimony does not prove what Plaintiffs suggest it proves.

Dean Witter points out in its memorandum in opposition to plaintiffs' motion for extended discovery that Ms. Romero completed two affidavits. The first affidavit was obtained by John Holland, one of the attorneys for plaintiffs. He quotes Ms. Romero as stating that overtime was never paid to employees at the Denver Tech Center, and "this was also well known by the Branch Managers ..., and in the New York Payroll Department...." Pl. Mtn, ¶ 18. Thus, plaintiffs argue, through Mr. Holland, "[t]he overwhelming evidence here is that the Dean Witter Reynolds' managers locally and the company nationally knew these workers were working many hours of overtime which they reported on their Time and Absentee Report sheets, but for which they received no compensation." *Id.*

After she completed the first affidavit, referenced by Mr. Holland, Ms. Romero completed a second one for Dean Witter. In her second affidavit, she stated that the first affidavit was inaccurate in certain respects, and that Mr. Holland had failed to include important information which she had provided to him. Ms. Romero stated:

At the beginning of the meeting, Mr. Holland showed me a four or five page document he identified as an "affidavit," that he already prepared for me to sign. I told him I did not agree with some of what was in his "affidavit" and could not sign it. I specifically told him that as far as I knew, Dean Witter did not have a national policy of not paying overtime to nonexempt full time workers. I asked that he clarify the statement in paragraph 2 that this was only his client's allegation. I believed he had done so.

Deft Opp., Ex C, ¶ 3.

In light of Ms. Romero's overt criticisms about the manner in which her first affidavit had been obtained, and the manner in which she states that the tone and substance of her remarks had been distorted or mis-quoted by Mr. Holland, I place no weight on the first affidavit in my consideration of the present motion to extend discovery. I look, instead, to the contents of Ms. Romero's second affidavit. She stated there that Dean Witter "*did* offer overtime to employees who wanted to work Saturdays, and ... *that* the Company required that overtime be authorized by management *not* that the Company would not pay for overtime actually worked." *Id.* at ¶ 4 (emphasis in original). She stated that she had never been told by any Dean Witter administrator to not report an employee's overtime, and she stated that she reported on the TAR's overtime that was so designated by employees. *Id.* at ¶ 15.

Ms. Romero pointed out in her affidavit that she had "no access to payroll records and [had] no way of knowing what, in fact employees get paid and whether they get paid for overtime work or not." *Id.* at ¶ 8. Further, Ms. Romero stated that she had no way of knowing whether employees were being denied overtime because "none of the employees ever came to me to complain that they were working overtime and not getting paid for it." *Id.* at ¶ 14.

Plaintiffs quote Ms. Romero as stating in her first affidavit:

There is a space on each Time & Absentee Report sheets for totaling overtime. It is called "Total Overtime" ... *The non-exempt, full-time workers never made entries in the overtime column* ... Based on my review of all the Bate-stamped time sheets for this same period, it is also clear that, with very rare and minor exceptions, I almost never filled this "Total Overtime" column out for any of the non-exempt, full-time workers regardless of the overtime they reported.

Pl. Reply, p. 12, (emphasis supplied by plaintiffs). Plaintiffs conclude from this that at the Denver Tech Center office "operations managers or branch managers *usually did not total or reduce the number of hours recorded by the workers in their own hands* to 40 hours." Thus, they left the "WKLY TTL" columns mostly empty." Pl. Mtn, ¶ 10, (emphasis in original).

Assuming that these statements of Ms. Romero in her first affidavit are accurate, her statements might explain how and why the employees at the Denver Tech Center failed to receive compensation for the overtime hours which they worked. According to Mr. Castrogiovanni: nothing in the weekly total column means no overtime pay. The evidence from Ms. Romero suggests that the failure of the Denver Tech Center employees to receive overtime is related to the failure of someone, whether employee or supervisor, to provide a number in the weekly total column which would prompt the Payroll Department to pay overtime.

Apparently, none of the plaintiffs or Denver Tech Center affiants ever complained either to someone locally or to the Payroll Department in New York City that they had not been paid for the overtime hours which a plaintiff had recorded in the daily columns. At least, no such complaints have been produced or mentioned by plaintiffs. However, other evidence which has been presented in conjunction with this motion to extend discovery tends to indicate that if such complaints had been made by employees, they would have been paid the overtime—assuming that the overtime work was pre-approved by management, as the policy required. Neither Ms. Romero nor Mr. Castrogiovanni suggested anything to the contrary. In fact, Mr. Castrogiovanni stated in his affidavit that if any employee questioned the failure of Dean Witter to pay for all of the hours which

the employee had worked and recorded, the Payroll Department

> would pull the relevant TAR forms and then merely do a tabulation of the hours that employee reported as having been worked. If this calculation showed that an employee had indeed recorded overtime, the overtime pay would be paid.

Defts' Opp., Ex. E, ¶ 7. In other words, although the Payroll Department employees ordinarily did not add up the daily totals on a TAR, upon receiving a complaint from a particular employee they would do so, and would then issue a check for the corrected amount which resulted from the addition. *Id.* If plaintiffs have failed to complain, or asked for a correction, about their failures to receive overtime, it is possible that the failure to receive overtime is related, in part, to their own inaction.

### IX.  ALLEGED NATIONAL PATTERN OR PRACTICE

Plaintiffs have presented evidence from which a jury could find, if it wished, that they were not paid for overtime hours which they worked. For purposes of the present motion, Dean Witter does not dispute this claim. Because the validity of this complaint is one of the issues to be decided in this lawsuit, I reach no conclusions with regard to it. However, even if it is true that some individuals failed to receive appropriate compensation for hours which were worked overtime, that fact alone does not lead me to conclude that there *must* be some unlawful national policy out there somewhere. Plaintiffs presented no evidence of any such national policy, and they presented no evidence from which I may conclude that their failure to receive overtime was prompted or caused, even in part, by the implementation in Denver of any national policy to deny overtime compensation.

The same is true with regard to the experiences of the women in the Alaska and Florida offices. Because plaintiffs have presented no evidence that Dean Witter has published a national *policy* which directs local offices to act in contradiction to the published policy which is contained in Exhibit A, discussed above in Part IV, I cannot infer or conclude that the two employees in Alaska and Florida were denied overtime as a result of efforts by the branch managers in those offices to implement such a policy. As noted for the Denver Tech employees, there are a number of variables which can affect the failure to receive overtime: (a) absence of pre-approval, (b) failure to record a number in the total column, (c) failure to seek a correction, or (d) a misunderstanding of the national policy by particular supervisors or employees.

Thus, in the absence of evidence which eliminates such variables, plaintiffs' recitation of a few examples of employees who failed to receive overtime fails to demonstrate that the failures were due to the implementation of a national policy. This is particularly true in this present case, where plaintiffs have presented no affidavit or deposition from *anyone* who stated that they knew of a national policy under which the employees were to be denied overtime compensation.

The evidence presented by plaintiffs suggests nothing more than that, out of 8000 employees in 400 separate offices, 10 women in 3 separate offices failed to receive overtime compensation after allegedly reporting overtime hours. Absent some causal link between a common and identifiable wrongful act on the part of Dean Witter and the denial of overtime compensation in separate offices, plaintiffs cannot demonstrate the "commonality" which is required by Rule 23. *See e.g., Grayson v. K–Mart Corp.,* 849 F.Supp. 785, 788 (N.D.Ga.1994).[1] Without any evidence of an unlawful policy on the part of Dean Witter, there is no basis from which I can con-

---

1.  Contrary to plaintiffs' argument in their "Motion and Memorandum for Reconsideration of the Court's Order Denying Tonita Pulliam's Motion to Join," this decision by District Court Judge Carnes was not "overturned" by the Eleventh Circuit in *Grayson v. K–Mart Corp.,* 79 F.3d 1086 (11th Cir.1996). Pl. Mtn/Memo. for Reconsideration, p. 2. Rather, the Circuit Court stated, "We also will dismiss K Mart's appeal of Judge Carnes' order of October 28, 1994 which had dismissed the Grayson actions without prejudice. We do so because we lack appellate jurisdiction over an order which we here hold to be non-final and hence, not appealable." *Grayson* at 1090–91. The Circuit Court then discussed and reversed an order from another district court, but did not address the decision by Judge Carnes.

clude that extended discovery by plaintiffs will ever yield a pattern or practice among the Dean Witter offices which is pursuant to a national policy.

Arguably, plaintiffs could attempt to prove the existence of a "national policy" by presenting evidence of an unlawful employment practice which was repeated so frequently that it might be inferred that the practice was occurring due to directives from Dean Witter headquarters. Indeed, that is precisely the effort which plaintiffs hope to undertake if provided the opportunity to conduct extended discovery. However, as noted above, extended discovery should not be allowed to plaintiffs if they can present no evidence, or if they present insufficient evidence, to warrant a conclusion that extended discovery is reasonably likely to yield support for the class allegations which have been made, particularly if the extended discovery will result in undue prejudice to Dean Witter. *Severtson v. Phillips Beverage Co.*, 137 F.R.D. at 267; *Mantolete v. Bolger*, 767 F.2d at 1424.

Plaintiffs argue that "the evidence they have now secured in the course of initial 'local discovery'" concerning the overtime pay practices of the Dean Witter Reynolds Denver Tech Center office permitted by this Court provides sufficient preliminary evidence of a nationwide "*de facto* policy and practice" to warrant the requested expansion of discovery." Pl. Mtn, p. 30. They state further that:

[i]t is difficult to imagine how plaintiffs could in more detail demonstrate such a problem with national implications than they have here. The evidence attached hereto demonstrates a systematic policy and practice, implemented and carried out by the New York Payroll Department, of refusing to pay overtime wages to full-time, non-exempt workers....

*Id.* at 27. I find that the evidence which has been presented by plaintiffs provides no support for the arguments and conclusions which they are asserting, and is far from the type and quantity of evidence which should be presented before an order for extended discovery is entered.

First, plaintiffs have presented no evidence of an unlawful national policy which was published by Dean Witter, and have provided no evidence of any unlawful policy or practice in the Payroll Department. On the contrary, the evidence which has been presented by plaintiffs and Dean Witter establishes that Dean Witter makes overtime compensation available to non-exempt employees if overtime hours are pre-approved by a supervisor. Deft Opp., Ex. A. The evidence also establishes that the Payroll Department pays overtime to employees if someone completes the weekly total column with a number which is greater than 40 hours per week. Deft Opp., Ex E. The evidence does not support plaintiffs' assertion that "contrary to its ... written policy, Dean Witter Reynolds has a nationwide *de facto* policy and practice of refusing to pay overtime wages as required by the FLSA...." Pl. Mtn, p. 20. The evidence is undisputed that the New York Payroll Department, in practice, carried out the national policy of Dean Witter. As a result, plaintiffs have not demonstrated at all that there is an employment problem with "national implications."

Second, the evidence which has been collected thus far by plaintiffs, primarily from the Denver Tech Center, is inadequate to warrant the conclusions, or even the hopes, that plaintiffs propose. Plaintiffs have shown nothing more than that out of 8,000 employees, 10 (or possibly only 9) of them complained of a failure to receive overtime compensation which they claim to have earned. The 9 or 10 employees represent no more than approximately 1/1000 of the 8,000 employees. All of the depositions and affidavits which plaintiffs and Dean Witter submitted contradict any claim or argument that plaintiffs' failure to obtain overtime compensation was pursuant to a national policy. In fact, the evidence from the Denver Tech office suggests that plaintiffs were deprived of overtime compensation for reasons which were specific to Denver, and were unrelated to any national policy: no one filled out the weekly total column, and no one complained. I need not determine whether this was error on the part of Ms. Romero or on the part of the employees. I need only determine, as I have, that plaintiffs have presented insuffi-

cient evidence to convince me that they should be allowed national discovery in order to attempt to demonstrate that plaintiffs were deprived of overtime as a result of national policy.

Third, plaintiffs have not presented evidence which leads me to conclude that the events in Denver, when joined and considered with the events in Alaska and Florida, constitute part of a pattern or practice from which I may infer that the branch managers of Dean Witter, on a nationwide basis, or pursuant to a national policy, are denying overtime compensation to its non-exempt employees. Plaintiffs' evidence does not rise to the level of a suspicious pattern of a problem with national implications. There are 400 offices in Dean Witter's organization, and plaintiffs have shown, at best, that in Alaska one former employee was denied overtime, in Florida one former employee was denied overtime, and at the Denver Tech Center seven employees have reported that they were denied overtime. These numbers reflect that plaintiffs presented evidence of possible problems in less than one percent of the total offices.

### X. CONCLUSION

The evidence demonstrates that the national policy of Dean Witter is to award overtime pay, when pre-approved, in compliance with the FLSA. The evidence also demonstrates that the Payroll Department for Dean Witter acts in compliance with this policy by paying for overtime hours, whether pre-approved or not, when it receives a Time and Absentee Report which has been properly completed by either a supervisor or employee.

Plaintiffs have failed to present any evidence to support their claim that that Dean Witter maintains or pursues a national policy which is in violation of the FLSA. The testimony of the seven individuals from the Denver Tech Center with regard to the practice in that office do not support an inference that they were denied overtime as a result of a national "policy" or "practice," as those words were used, or misused, by plaintiffs. Even when the testimony of the Denver employees is combined with those from the three Alaska, Florida and California employees, plaintiffs' evidence fails to demonstrate that the circumstances are sufficiently suspicious that plaintiffs should be allowed discovery on a national scale. The variables which surround the denial of overtime in all of the reported cases undermine plaintiffs' assertions that the events form a pattern which reflects, or even tends to reflect, a national policy or practice.

It is therefore ORDERED that plaintiffs' Motion to Extend Discovery [filed September 16, 1997] is DENIED.